UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

LAWRENCE ALBERT SWEET,

                    Plaintiff,

        v.                                          Case No. 23-cv-980-pp

BROWN COUNTY JAIL, *et al.*,

                    Defendants.

**ORDER GRANTING PLAINTIFF'S MOTION FOR LEAVE TO PROCEED
WITHOUT PREPAYING FILING FEE (DKT. NO. 2), DENYING PLAINTIFF'S
MOTION TO APPOINT COUNSEL AND FOR DISCOVERY (DKT. NO. 9) AND
SCREENING COMPLAINT UNDER 28 U.S.C. §1915A**

Lawrence Albert Sweet, who is incarcerated at Dodge Correctional Institution and is representing himself, filed a complaint under 42 U.S.C. §1983, alleging that the defendants failed to provide timely and adequate treatment of his chronically high blood pressure. This decision resolves the plaintiff's motion for leave to proceed without prepaying the filing fee, dkt. no. 2, denies his motion to appoint counsel and for discovery, dkt. no. 9, and screens his complaint, dkt. no. 1.

I.     **Motion for Leave to Proceed without Prepaying the Filing Fee
       (Dkt. No. 2)**

The Prison Litigation Reform Act (PLRA) applies to this case because the plaintiff was incarcerated when he filed his complaint. See 28 U.S.C. §1915(h). The PLRA lets the court allow an incarcerated plaintiff to proceed with without prepaying the civil case filing fee. 28 U.S.C. §1915(a)(2). When funds exist, the plaintiff must pay an initial partial filing fee. 28 U.S.C. §1915(b)(1). He then

1

must pay the balance of the $350 filing fee over time, through deductions from his prison trust account. Id.

On August 4, 2023, the court ordered the plaintiff to pay an initial partial filing fee of $14.94. Dkt. No. 6. On August 18, 2023, the court received $54 toward the fee. The court will grant the plaintiff's motion for leave to proceed without prepaying the filing fee and will require him to pay the remainder of the filing fee over time in the manner explained at the end of this order.

## II.     Screening the Complaint

### A.     Federal Screening Standard

Under the PLRA, the court must screen complaints brought by incarcerated persons seeking relief from a governmental entity or officer or employee of a governmental entity. 28 U.S.C. §1915A(a). The court must dismiss a complaint if the incarcerated person raises claims that are legally "frivolous or malicious," that fail to state a claim upon which relief may be granted, or that seek monetary relief from a defendant who is immune from such relief. 28 U.S.C. §1915A(b).

In determining whether the complaint states a claim, the court applies the same standard that it applies when considering whether to dismiss a case under Federal Rule of Civil Procedure 12(b)(6). See Cesal v. Moats, 851 F.3d 714, 720 (7th Cir. 2017) (citing Booker-El v. Superintendent, Ind. State Prison, 668 F.3d 896, 899 (7th Cir. 2012)). To state a claim, a complaint must include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The complaint must contain enough facts,

2

"accepted as true, to 'state a claim to relief that is plausible on its face.'"
Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v.
Twombly, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the
plaintiff pleads factual content that allows a court to draw the reasonable
inference that the defendant is liable for the misconduct alleged." Id. (citing
Twombly, 550 U.S. at 556).

To state a claim for relief under 42 U.S.C. §1983, a plaintiff must allege
that someone deprived him of a right secured by the Constitution or the laws of
the United States, and that whoever deprived him of this right was acting
under the color of state law. D.S. v. E. Porter Cnty. Sch. Corp., 799 F.3d 793,
798 (7th Cir. 2015) (citing Buchanan–Moore v. County of Milwaukee, 570 F.3d
824, 827 (7th Cir. 2009)). The court construes liberally complaints filed by
plaintiffs who are representing themselves and holds such complaints to a less
stringent standard than pleadings drafted by lawyers. Cesal, 851 F.3d at 720
(citing Perez v. Fenoglio, 792 F.3d 768, 776 (7th Cir. 2015)).

B.    The Plaintiff's Allegations

The complaint names as defendants Pod Officer Loren, Captain or Jail
Administrator Heidi Michele, Nurse K. Oviedo, Vitalcore Health Services, Brown
County Health and Human Services, Brown County Jail and seven Jane Doe
Nurses. Dkt. No. 1 at 2–3, 12. The complaint alleges that all individual
defendants work at the Brown County Jail. Id. The plaintiff is suing the
defendants in their official capacities only. Id. at 2–3.

The plaintiff's complaint contains two documents; the first is a long-form "Complaint for Violation of Civil Rights" that the plaintiff filled out. Id. at 1–11. That document lists some of the defendants; on it, the plaintiff says that he is suing the defendants for "medical malpractice due to direct indifference" and "cruel and unsual [*sic*] punishment inflicted." Id. at 2–3. He says he was a pretrial detainee when the alleged events occurred, and he lists the relevant days in March, April and June 2023. Id. at 4–5. In the area where the plaintiff is told to list the facts underlying his claim, the plaintiff wrote, "The nurse listed on the attached paper was deliberate indifference [*sic*] when they seen [the plaintiff's] blood pressure high at 280 over 136 and did nothing about it." Id. Under "injuries," the plaintiff listed various medical tests, including EEG, EKG, MRI and "emergency heart catheder [*sic*] procedure." Id. He alleges that his "blood pressure was so high that [he] was waiting for over 15 minutes for medical staff to help [him] before [he] could've died." Id. The plaintiff checked boxes affirming that he had exhausted his administrative remedies before filing this complaint. Id. at 6–8.

The second part of the complaint is handwritten. Id. at 12–21. In this part, the plaintiff lists all the defendants and says that jail staff refused to provide him the names of the Jane Doe nurses. Id. at 12. The plaintiff's narrative of events begins on March 8, 2023, when he says he underwent a physical exam that showed he had high blood pressure. Id. at 13. He told the nurse who conducted the exam that he was diagnosed with "major depression, A.D.H.D., P.T.S.D[.] High Vigilance." Id. The next day, March 9, 2023, the

4

nurse again checked his vitals. Id. The plaintiff says that the nurse "had to recheck vitals because she thought the instrument was defective." Id. The nurse told the plaintiff she would speak with a doctor, who likely would prescribe medication for the plaintiff. Id.

The complaint alleges that on March 10, 2023, nurses did not take the plaintiff's vitals or provide him medication. Id. At around 4:15 p.m., the plaintiff "started feeling [his] heartbeat quicken, tightness in [his] chest and [a] real bad headache." Id. He stopped Pod Officer Fox (who is not a defendant) during his rounds, told Fox that he (the plaintiff) was not feeling good and explained his symptoms. Id. Fox pulled the plaintiff from his cell and took him to a dayroom by the officer station "to keep a[n] eye on [him]." Id. Fox also called medical and told them he had a detainee complaining of chest pains, "eyes were red, face flushed, and sweaty." Id. The plaintiff says he overheard Fox say, "Looks like he needs attention immediately." Id. The plaintiff nonetheless waited fifteen minutes without receiving medical attention. Id. Fox again called medical and said, "WTF? I called over 15 mins ago telling you that I have a[n] inmate here not doing very good . . . Are you fucking coming?" Id.

The plaintiff says nurses finally arrived, twice took his vitals and told him his blood pressure was 236 over 112. Id. at 14. The nurse "said to call it in as medical emergency," and a medical team arrived as the nurse was taking the plaintiff's blood pressure a third time. Id. A corporal who was part of the response team called for an ambulance to take the plaintiff to a hospital. Id. The plaintiff says he waited another fifteen minutes for the ambulance to

5

arrive. Id. The paramedics who moved the plaintiff into the ambulance began an IV and gave him "nitro because [his] vitals were so high." Id. The paramedics took the plaintiff to the emergency room at the hospital (the plaintiff does not say which hospital) to determine why his blood pressure was so high. Id. He says that his blood work showed that his "heart was producing 'Thampron' which is a[n] enzyme the heart releases when it becomes very stressed," often during a heart attack, stroke or seizure. Id. The plaintiff was transferred to the intensive care unit, and he remained at the hospital for three days. Id.

Back at the jail on March 14, 2023, another nurse took the plaintiff's vitals and "said that it was at such a high level that she was required to call a Doctor." Id. But the nurse told the plaintiff "that because she just gave [him] his] meds that she was going to wait until she completed her rounds." Id. at 14–15. After waiting forty-five minutes, the plaintiff told Pod Officer Berth (not a defendant) "that it didn't make sense to [him]." Id. at 15. Berth confirmed with the plaintiff what the nurse had said and told the plaintiff, "that's BS[.] [T]his is the same situation that happen[ed] last [F]riday with you." Id. Berth called for medical staff, and a nurse immediately came to take the plaintiff's vitals and provide him "two doses of clannodine." Id. She told him that "the Doctor was coming to see [him] within a[n] hour." Id.

The next day, March 15, 2023, during evening medication pass, the plaintiff told the nurse providing medications "that she was also suppose[d] to be taking [his] blood pressure due to recent hospitalization and per Brown County Jail Doctor order." Id. The nurse took the plaintiff's blood pressure,

which was 200 over 106. Id. The plaintiff told the nurse that "the Doctor said levels of 180/? are gonna be acceptable for the next couple of weeks." Id. at 15–16. The doctor also told the plaintiff to inform jail staff if he felt dizzy or nauseous, had chest pains or felt his heart rate increase. Id. at 16. He also was to tell staff if his "Blood pressure was 200/? or more." Id. The nurse told the plaintiff she would call the doctor. Id.

The plaintiff says he returned to his cell and "accidently locked [him]self in so [he] pressed the button." Id. Officer Loren answered his call, and the plaintiff told him that his blood pressure was high, and he was waiting for the doctor. Id. Loren unlocked the plaintiff's cell, asked the plaintiff to repeat what he had said and then told him to "return to [his] bunk and lay down" until the doctor arrived. Id. The plaintiff waited on his bunk for fifteen minutes, but he then saw the nurse leave the pod with her medication cart. Id. He also saw pod officers finish their rounds and turn off the lights for the evening. Id. The plaintiff says that his cellmate "was up pacing the floor worried that something was wrong with [the plaintiff] again." Id. The plaintiff asked his cellmate to keep track of the officers coming to and leaving from the pod. Id. His cellmate recorded the officers entering and then leaving their pod four times before 11:30 p.m., but they never came to check on the plaintiff. Id. at 16–17.

The plaintiff eventually pressed his intercom button, and the woman who answered asked "whats [your] medical emergency." Id. at 17. The plaintiff told her that he needed to call the doctor about his high blood pressure, and nobody had come to check on him again. Id. Officer Loren immediately

7

returned to his cell and told the plaintiff that "he was just down at HSU [Health Services Unit]" asking if anyone had come to check the plaintiff's vitals. Id. A nurse then appeared at the plaintiff's cell and provided him a dose of Clannodine. Id. She did not check his vitals and told him to drink water. Id. Then the nurse and Loren left. Id. The plaintiff discussed the events with his cellmate, who "shook his head." Id. The plaintiff says that about thirty minutes later, he "must [have] gotten up to get water," but he blacked out or passed out and began to fall. Id. His cellmate grabbed him and "swung [him] onto [his] bunk." Id. The plaintiff "came to" and asked his cellmate what happened. Id. The plaintiff claims his cellmate "probably just saved [his] life because if [he] would've went cardiac arrest or split [his] head [*sic*]." Id. at 17–18.

On March 31, 2023, during morning medication pass, the plaintiff complained to a nurse that his chest felt tight, and his heart was racing. Id. The nurse took his blood pressure, "which was high." Id. She told him to lay down and that "someone would be back later to recheck." Id. The plaintiff waited an hour before telling Officer Berth that he did not feel good. Id. He says, "It was happening fast like last time." Id. Berth called the HSU, and staff came immediately to check on him. Id. The plaintiff says his symptoms had worsened, and he "was doubled over crying" from the pain. Id. Medical staff took his blood pressure and called for an ambulance. Id. The nurse told him that staff would bring a wheelchair to take him to the sally port to meet the ambulance. Id. Another nurse asked for the plaintiff's medical files and told him she would ride to the hospital with him. Id. at 18–19. The plaintiff says he

waited five minutes in the ambulance before the driver realized the plaintiff had been loaded in and was ready for transport to the hospital. Id. at 19. A paramedic gave the plaintiff "two nitro pills," and a sheriff's deputy told the driver to drive the plaintiff to the hospital. Id. The plaintiff was taken to the emergency room, where hospital staff performed "an emergency heart cather [*sic*] procedure." Id. The plaintiff returned to the jail on April 1, 2023. Id. He says a nurse told him he "was lucky" to be alive and would "probably be dead if [he] wasn't [at the jail] due to the amount of meth [he] was doing on the streets." Id.

On April 7, 2023, during morning medication pass, the plaintiff again informed an officer that he was experiencing tightness in his chest and felt his heart racing. Id. Nurses came, took the plaintiff's blood pressure and gave him Clannopin. They told him to lay down and to practice deep breathing and meditation. Id. A nurse told the plaintiff she would ask the doctor to review his medical file and recommend he "see mental healt[h] for anxiety and prescribe medication to control [his] depression." Id. The plaintiff does not know whether this person was actually a nurse. Id.

The same day, a new incarcerated person joined the plaintiff's pod at the jail. Id. at 20. The plaintiff says he knew this person from an earlier court date in March 2023. Id. This person told the plaintiff "how unpleasant and bizarre his stay at [the jail] has been" and how "his civil rights are being violated." Id. He told the plaintiff that while on another housing pod, he "heard and wit[]ness a man die next door to him." Id. He said "he heard the man chokeing [*sic*],

gangling [*sic*]." Id. This person told the plaintiff that the other incarcerated person had a blood pressure cuff and heart monitor on his finger, and ankle bracelets on his legs. Id. But he said, "nobody did nothing as they said and waited for the ambulance, paramedics to arrive." Id. The plaintiff says he began to realize that "the same scenario seemingly happened to [him] on" March 10, 2023. Id. He recalled a shutdown at the jail on April 8, 2023, for a "'10-90' code call on the radio." Id. He also recalled hearing sheriff's deputies say that one detainee in the intensive care unit "probably wasn't gonna make it," that jail "nurse[s] are over stepping their authority" and that nurses were "trying to override doctors orders." Id. at 20–21.

In the evening on April 7, 2023, the plaintiff was sleeping, but he says a nurse "left without even checking on [him] without asking for a refusal or anything." Id. at 21. He says a pod officer told him "it was [his] fault that [he] didn[']t get meds." Id. The officer nonetheless told the plaintiff that he would call medical staff to provide his blood pressure medication, and about fifteen minutes later a different nurse brought him his medications. Id.

On August 21, 2023, the court received a letter from the plaintiff regarding his payment of the initial partial filing fee. Dkt. No. 7. Attached to that letter is a handwritten statement from the plaintiff, id. at 2–5, several pages of communications the plaintiff received or sent through the jail's kiosk, dkt. no. 7-1 at 2–11, and more pages of grievances or requests from August 2023, id. at 12–16. Beginning on page 17 are more facts alleged in the same style as the second part of the plaintiff's complaint. Id. at 17–21. The plaintiff

says in these additional allegations that on April 8, 2023, he was moved to medical observation for refusing his medication, which the nurses deemed "a harm to [his] health/safety and over all well being." Id. at 17.

On April 12, 2023, after the plaintiff spent the previous four days refusing his medication, a mental health caseworker spoke with him for about ten minutes. Id. Three officers came to his cell an hour later with a safety blanket and a smock. Id. They told the plaintiff "that by state law they were mandated to abide by mental health order, and mental health said [he] was a threat to [him]self." Id. They ordered the plaintiff to change into the smock so they could transfer him to "a safety room." Id. The plaintiff "refused and said [he]'d fight." Id. Corporal Higgins (not a defendant) reasoned with the plaintiff to comply, saying he would let the plaintiff remain in the same room. Id. The plaintiff complied. The plaintiff alleges that later that afternoon, he suffered what he believes was a seizure but was eventually able to get up and press his intercom button for help. Id. The plaintiff asked to shower after his seizure because he was sweaty, and nurses came to take his vitals about a half hour later. Id. at 17–18. The "lead nurse" remarked that she knew the plaintiff's blood pressure would "be through the roof" and advised him it would get worse if he did not take his medication. Id. at 18. The plaintiff decided to take his medication. Id.

The plaintiff alleges that the next day—April 13, 2023—mental-health staff spoke with him again along with a chaplain. Id. The plaintiff says he is Native American, and his beliefs include very limited medical treatment: no life

support, no organ donation, no autopsy and a "do not resuscitate" (DNR) directive. Id. He says he even prefers not to take medication, which he calls "a form of life support." Id. The plaintiff says jail staff and State of Wisconsin officials "strongly disagree with [his] perception" and insist the jail does not need to follow his DNR directive. Id.

The plaintiff says that around 6:00 or 6:30 that evening, an officer performing rounds found the plaintiff having a seizure and "foaming at the mouth." Id. at 19. The officer immediately called a nurse, and she called for an ambulance. Id. Officers turned the plaintiff on his side and placed him in restraints, but the nurses did not check his vitals. Id. The paramedics arrived about fifteen minutes later and stretchered him into the ambulance. Id. The plaintiff was placed in the Intensive Care Unit for two days while staff ran tests on him. Id. They diagnosed him with "stage 2 high blood pressure with hyper tention [sic]." Id. A neurologist told the plaintiff he had "probably developed seizure from running such a high level of blood pressure for such a long period of time." Id.

The plaintiff returned to the jail on April 15, 2023, and resumed taking his medication. Id. But he says he "was having issues with the nurses," who were not following his doctor's orders to take his blood pressure three times per day. Id. He also says the nurses did not take his blood pressure until hours after he was given his medication. Id. When the plaintiff asked about the nurses' actions, they claimed "that the doctor wanted an accurat[e] reading" and they had "a defective cuff" to take his blood pressure. Id. The plaintiff

complained to an officer who overheard his interaction with the nurses. Id. at 19–20.

On June 27, 2023, the plaintiff's cellmate "found [him] on [his] bunk" during the evening count and called for help. Id. at 20. Officer Loren came "and immediately called for medical." Id. A nurse came to take the plaintiff's vitals and asked what was wrong. Id. The plaintiff complained that his chest hurt and his heart was racing. Id. Officers brought the plaintiff a wheelchair and took him to the HSU, where a nurse was waiting for him in an exam room. Id. The nurse performed an EKG test, but after a few minutes she said she had to call the doctor. Id. The plaintiff was taken back to his wheelchair and overheard the nurse tell the doctor that the test "was inconclusive," and that his vitals were high. Id. The nurse ended her call with the doctor and told the officers to call an ambulance to send the plaintiff to the emergency room. Id. The officer wheeled the plaintiff to intake, locked the wheels on the chair and left him to wait for the ambulance. Id. A nurse came five minutes later and gave the plaintiff chewable baby aspirin that the doctor ordered the plaintiff to take. Id. at 20–21. The ambulance arrived and took the plaintiff to the emergency room. Id. at 21.

The plaintiff alleges that on July 18, 2023, at around 12:45 p.m., he asked an officer to come by his cell door to tell her that he believed he had a seizure while the officer was away on her break. Id. The officer called a nurse, who came by twenty minutes later to take the plaintiff's vitals. Id. He says his blood pressure was 233/136. Id. She asked if the plaintiff had taken his

medication, and he told her he had not in about five days. Id. The nurse advised him that if he continued not to take his medication, his blood pressure would likely get higher, and he would "probably be dead." Id. The plaintiff nonetheless told the nurse he was "done taking pills." Id. The nurse left, and about an hour later three officers came to the plaintiff's cell to place him on suicide watch. Id. The plaintiff says he "freaked out, got restrained and almost tasered," but he warned the officers that they might kill him if they used their tasers because of his high blood pressure. Id. The officers tied the plaintiff to a chair, and Corporal Higgins told him he would have to remain restrained for six hours minimum. Id. Corporal Bartels came an hour later and removed the restraints, so long as the plaintiff "g[a]ve [his] word no more b.s." Id.

The plaintiff also attached to his complaint grievances he filed at the jail in March and April 2023 and the responses he received. Dkt. No. 1-1. The plaintiff filed the first of these grievances on March 15, 2023, about the March 10, 2023 incident during which he had to wait for treatment before being taken to the hospital. Id. at 2. Nurse Oviedo responded to the plaintiff's grievance because she "was the nurse who responded to the initial call from officer fox" about the plaintiff's condition. Id. at 3. Nurse Oviedo wrote that she and another nurse "RAN down to the pod" to take the plaintiff's blood pressure, "which was extremely high." Id. She wrote that she had another nurse take his blood pressure to confirm the high reading, and then she "immediately called the watch commander to have them call 911." Id. She took his blood pressure again "multiple times to monitor [him] until the ambulance arrived." Id. Nurse

Oviedo explained that "in such a situation it can seem like a long time but it was not 15 minutes before anyone arrived. And the appropriate care was given to [him] at that time." Id. She denied the plaintiff's grievance as unsubstantiated. Id.

The plaintiff filed a grievance on March 16, 2023 about the nurse who took his blood pressure on March 15, 2023, but refused to call the doctor when the results were very high. Id. at 4. This was the incident after which the plaintiff passed out, and his cellmate caught him and placed him back on his bunk. Id. at 5. Nurse Oviedo again responded to the grievance and explained that "nurses have to get orders before giving medications even if your blood pressure is high." Id. at 7. She recounted that the plaintiff told the nurse that he was given medications that day, and his blood pressure "the following morning was 160/110, substantially lower than the initial reading." Id. She advised the plaintiff "to be patient" because "worrying is only going to increase your blood pressure." Id. She denied the plaintiff's grievance as unsubstantiated. Id.

The plaintiff filed another grievance on March 17, 2023 about the nurse who failed to take his blood pressure that morning during medication pass. Id. at 6. Nurse Oviedo responded to the plaintiff's grievance and recounted that his "blood pressures are being taken as the doctor has ordered." Id. at 1. She listed the plaintiff's most recent blood pressure readings as 152/98, 139/91, 130/70 and 160/110. Id. Oviedo closed the grievance as unsubstantiated. Id.

The last grievance attached to the complaint is from April 2, 2023, and it involves an incident not alleged in the complaint about an officer who did not provide the plaintiff copies of his medications or his power of attorney after his hospital stay from March 10 to 13, 2023. Id. at 8. The plaintiff did not attach a copy of the response he received to this grievance, if he received one.

On September 5, 2023, the court received additional documents from the plaintiff. Dkt. No. 8. The plaintiff says these documents show "the continous [*sic*] violations of [his] 8th and 14th amendment rights by the people who custody [he is] under at the present time." Id. at 1. He says that jail staff are "sending [him] to a heart specialist in mid[-]Sept." Id. at 2. The plaintiff attached more grievances from the jail to this document, but the grievances are from August 2023 and do not involve the events alleged in the complaint from March and April 2023. Dkt. No. 8-1. The plaintiff has not advised the court whether he has since seen the heart specialist.

The plaintiff seeks $444 million in damages for his alleged treatment. Dkt. No. 1 at 5. The plaintiff says "others have died and [he is] taking legal action now so one else dies." Id.

C.    Analysis

The plaintiff alleges that he was a pretrial detainee at the time of the alleged events. Because the plaintiff was a pretrial detainee, the court analyzes his claim that he was denied adequate medical care under the Fourteenth Amendment. Miranda v. County of Lake, 900 F.3d 335, 352 (7th Cir. 2018) (citing Kingsley v. Hendrickson, 576 U.S. 389 (2015)). To proceed on this claim,

16

the plaintiff must show that 1) "the 'defendants acted purposefully, knowingly, or perhaps even recklessly'" and 2) "the defendants' actions were [not] 'objectively reasonable.'" Pittman by & through Hamilton v. County of Madison, Ill., 970 F.3d 823, 827 (7th Cir. 2020) (quoting Miranda, 900 F.3d at 353–54). Neither negligence, gross negligence nor medical malpractice amount to deliberate indifference. See Miranda, 900 F.3d at 353. The plaintiff's allegations must show "'more than negligence but less than subjective intent—something akin to reckless disregard'" to proceed on a Fourteenth Amendment claim. Id. at 353–54 (quoting Gordon v. County of Orange, 888 F.3d 1118, 1125 (9th Cir. 2018)).

The plaintiff alleges that on numerous occasions from March through July 2023, various officers and nurses were deliberately indifferent to his high blood pressure. He alleges that jail staff knew as early as March 10, 2023 that he had dangerously high blood pressure because he was taken to the hospital for emergency treatment after he complained of tightness in his chest and a racing heartbeat. He seeks to hold responsible one officer who worked on his pod (Loren), the jail administrator and eight nurses (only one of whose names he knows).

The plaintiff sues the defendants only in their official capacities. Claims against an official in his official capacity represent another way to plead a claim against the entity that he represents or for which the official works. Kentucky v. Graham, 473 U.S. 159, 165 (1985) (citing Monell v. New York City Dep't of Soc. Servs., 436 U.S. 658, 690, n.55 (1978)). The complaint alleges that the

individual defendants work at Brown County Jail. The plaintiff also sues two Brown County departments or divisions—Brown County Health and Human Services and Brown County Jail. The court construes the plaintiff's claims against the Brown County defendants as if they had been brought against Brown County itself. Id. at 165–66.

A local municipal or county government "cannot be held liable *solely* because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." Monell, 436 U.S. at 691 (emphasis in original). A municipality may "be held liable under § 1983 only for its own violations of federal law." Los Angeles County v. Humphries, 562 U.S. 29, 36 (2010) (citing Monell, 436 U.S. at 694). To demonstrate municipal liability, a plaintiff "must demonstrate that there was an 'official policy, widespread custom, or action by an official with policy-making authority [that] was the "moving force" behind his constitutional injury.'" Estate of Perry v. Wenzel, 872 F.3d 439, 461 (7th Cir. 2017) (quoting Daniel v. Cook County, 833 F.3d 728, 734 (7th Cir. 2016)). "[T]he touchstone of 'official policy' is designed 'to distinguish acts of the *municipality* from acts of *employees* of the municipality, and thereby make clear that municipal liability is limited to action for which the municipality is actually responsible.'" City of St. Louis v. Praprotnik, 485 U.S. 112, 138 (1988) (quoting Pembaur v. Cincinnati, 475 U.S. 469, 479–80 (1986) (emphasis in original)).

The plaintiff does not allege that any individual violated his rights under an official and unconstitutional Brown County policy, practice or custom. He

alleges that certain officers and nurses at the jail were deliberately indifferent to his high blood pressure and did not provide timely or appropriate treatment. He does not allege that those persons were following a Brown County policy, practice or custom when they disregarded his medical needs. The complaint does not contain sufficient allegations to hold Brown County liable for the actions of its employees. That means that the plaintiff cannot proceed on his claims against the Brown County defendants in their official capacities. The court will dismiss the Brown County defendants, including Officer Loren, Jail Administrator Michele, Nurse K. Oviedo, Brown County Health and Human Services, Brown County Jail and the Jane Doe Nurses.

The complaint also names as a defendant Vitalcore Health Services. The plaintiff does not mention Vitalcore anywhere in his complaint or explain what this organization is. Vitalcore's website says that it provides "community standards of healthcare in a correctional environment." See https://vitalcorehs.com/. The court can infer that Vitalcore provides healthcare to persons incarcerated at the Brown County Jail.

A private corporation, like Vitalcore, that has contracted to provide essential government services, such as health care for prisoners, "cannot be held liable under § 1983 unless the constitutional violation was caused by an unconstitutional policy or custom of the corporation itself." Shields v. Ill. Dep't of Corr., 746 F.3d 782, 789 (7th Cir. 2014). The private corporation may not be held liable for the actions of its employees under a theory of *respondeat superior*. Id. (citing Iskander v. Vill. of Forest Park, 690 F.2d 126, 128 (7th Cir.

1982)); see also Monell, 436 U.S. at 694. Instead, the plaintiff must allege "that his injury was caused by a [corporation] policy, custom, or practice of deliberate indifference . . . or a series of bad acts that together raise the inference of such a policy." Shields, 746 F.3d at 796 (citing Woodward v. Corr. Med. Servs. of Ill., Inc., 368 F.3d 917, 927 (7th Cir. 2004)).

As with his claims against Brown County, the plaintiff does not allege that he was provided inadequate medical care because of an unconstitutional policy, custom or practice of Vitalcore. He alleges that several nurses at the jail disregarded orders from his doctor to check his blood pressure three times per day and routinely provided untimely care for his chronically high blood pressure. It is possible that these nurses work for Vitalcore and not the Brown County Jail. Even if that is true, the complaint does not contain sufficient information to hold Vitalcore responsible for the actions of its employees for the reasons just explained. The complaint does not state a claim against Vitalcore, and the court will dismiss Vitalcore as a defendant.

The complaint does not state a claim against any defendant in his, her or its official capacity. The complaint alleges that individuals acting on their own accord violated the plaintiff's rights. Because the complaint seeks to proceed against the defendants in only their official capacities, the court must dismiss the complaint. It is possible that the plaintiff could state a claim against one or more defendants in their *individual* capacities; a claim against an individual in his or her individual capacity seeks to hold the individual accountable for his or her own actions. The court will give the plaintiff an opportunity to file an

amended complaint against any defendant(s) he wishes to sue in their individual capacity or capacities.

When writing his amended complaint, the plaintiff should provide the court with enough facts to answer the following questions: 1) Who violated his constitutional rights?; 2) What did each person do to violate his rights?; 3) Where did each person violate his rights?; and 4) When did each person violate his rights? **The plaintiff's amended complaint does not need to be long or contain legal language or citations to statutes or cases, nor does he need to include grievances and other exhibits to support his allegations.** The amended complaint must allege facts that provide the court and each defendant with notice of what each defendant allegedly did or did not do to violate his rights.

The court is enclosing a copy of its amended complaint form. The plaintiff must list the case number for this case on the first page. He must list all the defendants he wants to sue in the caption of the amended complaint. He should use the spaces on pages two and three to explain the key facts that give rise to the claims he wishes to bring, and to describe which defendants he believes committed the violations that relate to each claim. If there is not enough space on those pages, the plaintiff may use up to five additional sheets of paper, double-spaced so that the court can read them. The amended complaint takes the place of the prior complaint and must be complete by itself. The plaintiff may not refer the court back to his original complaint. He

must repeat in the amended complaint any of the facts from the original complaint that he believes are necessary to his claims.

If the plaintiff does not file an amended complaint by the deadline the court will set below, or if he notifies the court that he does not wish to proceed against any defendant in their individual capacity, the court will dismiss this case and will issue the plaintiff a strike because the complaint fails to state a claim. The court will not give the plaintiff a second opportunity to amend his complaint.

## III. Motions to Appoint Counsel and for Discovery (Dkt. Nos. 9, 12)

On September 22, 2023, the court received the plaintiff's motion asking "the court to appoint [him] counsel to help assist [him] in the class action civil lawsuit." Dkt. No. 9. The plaintiff also asks for "discovery for all information and material relevant to" policies and procedures of the jail's HSU, job outlines and descriptions of each defendant, any complaints or grievances filed against the defendants and video surveillance footage from the dates of events alleged in the complaint. Id. at 1–2. The plaintiff seeks "a conjunction order against Brown County[y] Jail and it's personel [*sic*]." Id. at 3. The plaintiff says jail staff "are aware of [his] lawsuit," and he believes "that for safety and health reasons [he] should be placed elsewhere." Id.

In a civil case, the court has the discretion to recruit counsel for individuals unable to afford counsel. Navejar v. Iyola, 718 F.3d 692, 696 (7th Cir. 2013); 28 U.S.C. §1915(e)(1); Ray v. Wexford Health Sources, Inc., 706 F.3d 864, 866–67 (7th Cir. 2013). "[D]eciding whether to recruit counsel 'is a

difficult decision: Almost everyone would benefit from having a lawyer, but there are too many indigent litigants and too few lawyers willing and able to volunteer for these cases.'" <u>Henderson v. Ghosh</u>, 755 F.3d 559, 564 (7th Cir. 2014) (quoting <u>Olson v. Morgan</u>, 750 F.3d 708, 711 (7th Cir. 2014)).

In exercising its discretion, the court must consider two things: "(1) 'has the indigent plaintiff made a reasonable attempt to obtain counsel or been effectively precluded from doing so,' and (2) 'given the difficulty of the case, does the plaintiff appear competent to litigate it himself?'" <u>Eagan v. Dempsey</u>, 987 F.3d 667, 682 (7th Cir. 2021) (quoting <u>Pruitt v. Mote</u>, 503 F.3d 647, 654–55 (7th Cir. 2007)). To satisfy the first prong, the court must determine that a plaintiff made a good faith effort to hire counsel. <u>Pickett v. Chi. Transit Auth.</u>, 930 F.3d 869, 871 (7th Cir. 2019). "This is a mandatory, threshold inquiry that must be determined before moving to the second inquiry." <u>Eagan</u>, 987 F.3d at 682. To do so, the plaintiff must show he contacted at least three lawyers and provide the court with (1) the lawyers' names; (2) their addresses; (3) how and when the plaintiff attempted to contact the lawyer; and (4) the lawyers' responses.

"The second inquiry requires consideration of both the factual and legal complexity of the plaintiff's claims and the competence of the plaintiff to litigate those claims." <u>Eagan</u>, 987 F.3d at 682. When considering the second prong, the court "must examine the difficulty of litigating specific claims and the plaintiff's individual competence to litigate those claims without counsel." <u>Pennewell v. Parish</u>, 923 F.3d 486, 490 (7th Cir. 2019). The court looks at

"whether the difficulty of the case, factually, legally, and practically, exceeds the litigant's capacity as a layperson to coherently litigate the case." Id. This includes "all tasks that normally attend litigation," such as "evidence gathering, preparing and responding to court filings and motions, navigating discovery, and putting on a trial." Id. at 490–91. The court "must consider the plaintiff's literacy, communication skills, education level, litigation experience, intellectual capacity, psychological history, physical limitations and any other characteristics that may limit the plaintiff's ability to litigate the case." Id. at 491. In situations where the plaintiff files his motion in the early stages of the case, the court may determine that it is "impossible to tell whether [the plaintiff] could represent himself adequately." Pickett, 930 F.3d at 871.

The plaintiff's first motion does not satisfy either criteria. The plaintiff does not say whether he has made any effort to obtain counsel on his own by contacting lawyers or firms and asking for assistance. If he did contact lawyers or firms, he does not say what their responses were, and he did not provide any letters or responses with his motion. Because the plaintiff has not shown that he made efforts to obtain counsel without the court's assistance, the court could deny his motion to appoint counsel on that basis alone.

But the plaintiff also fails to explain why he believes he needs a lawyer to adequately litigate this lawsuit. He does not explain why he believes he needs a lawyer's help, simply asking the court to provide him a lawyer. The court explained above that there are not enough attorneys to represent every *pro se* litigant, and the plaintiff's filings to date do not suggest he is one of those

litigants most in need of assistance to present his case. His filings are very lengthy and detailed. The plaintiff has a clear and thorough understanding of the facts of his case and his claims against the defendants. The court is dismissing his claims, but that does not mean he has not presented his complaint adequately. The court explained above that the plaintiff simply has chosen the wrong capacity in which to sue the defendants. The court has no doubt that the plaintiff can state a proper claim if he complies with this order and files an amended complaint.

The court received the plaintiff's second motion to appoint counsel on January 26, 2024. Dkt. No. 12. In this motion, the plaintiff lists seven lawyers that he has contacted, providing their addresses, phone numbers and email addresses; again he does not say what their responses were and he did not provide copies of any letters he sent to counsel or any responses he received from them. Id. at 2-3. The plaintiff says he called the Wisconsin Bar Association and "was told that they did not keep a list of civil litigation lawyers or pro bono lawyers. [He's] also in touch with the American Civil Liberties Union trying to pursue representation." Id. at 2. By showing that he made efforts on his own to find counsel, the plaintiff in this motion has satisfied the first inquiry that the court must address when deciding whether to recruit counsel. But, as the court noted above, the plaintiff's second motion also fails to explain why he can't litigate his case on his own at this stage and why he is one of those litigants most in need of a lawyer.

The court will deny without prejudice the plaintiff's motions to appoint counsel. If the plaintiff files an amended complaint and if this case proceeds, he may renew his request for counsel. But the plaintiff will need to show that there are reasons he cannot litigate the case on his own before the court will consider attempting to recruit a lawyer to represent him.

The court also will deny the plaintiff's motion for discovery because it is premature. Dkt. No. 9. The court is dismissing the plaintiff's complaint and allowing him to file an amended complaint. The court is not ordering service of the complaint on any defendant, so it is not yet time for the parties to engage in discovery. Discovery will begin in this case only if the plaintiff files an amended complaint and the court allows him to proceed on the claims in the amended complaint. Even then, there are several other steps that will occur before discovery begins. The court will give the plaintiff information along the way about the next steps in his case, one of which is discovery. The court advises the plaintiff to read carefully each of its orders to understand his responsibility and obligations as the plaintiff in this lawsuit.

The court does not know what the plaintiff means by his request for "a conjunction order." Dkt. No. 9 at 3. The court believes he may have meant to ask for an *injunction*, which is a court order telling a party to do or stop doing something. To obtain a preliminary injunction, the plaintiff must show that (1) his underlying case has some likelihood of success on the merits, (2) no adequate remedy at law exists, and (3) he will suffer irreparable harm without the injunction. Wood v. Buss, 496 F.3d 620, 622 (7th Cir. 2007). A preliminary

injunction is not appropriate to guard against the "mere possibility of irreparable injury." Orr v. Shicker, 953 F.3d 490, 501 (7th Cir. 2020) (citing Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 22 (2008)). If the plaintiff can establish those three threshold factors, the court then must balance the harm to each party and to the public interest from granting or denying the injunction. See Wood, 496 F.3d at 622; Korte v. Sebelius, 735 F.3d 654, 665 (7th Cir. 2013); Cooper v. Salazar, 196 F.3d 809, 813 (7th Cir. 1999). A preliminary injunction is "an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." Mazurek v. Armstrong, 520 U.S. 968, 972 (1997).

The plaintiff has not satisfied any of the three elements required to obtain a preliminary injunction. He has not described the conduct he seeks to enjoin. He says Brown County staff are aware of his lawsuit, and he feels that his safety and health are at risk. But he does not allege that anyone at the jail has put his safety or health in jeopardy because he filed this lawsuit, nor does he say that anyone has threatened to harm him because of this lawsuit.

The court also does not have the authority to transfer the plaintiff to another institution as he asks. Courts do not tell jails or prisons where to house the people incarcerated there; jail and prison staff, not judges, best know how to administer jails and prisons. And under the PLRA, any preliminary relief that the court provides "must be narrowly drawn, extend no further than necessary to correct the harm the court finds requires preliminary relief, and be the least intrusive means necessary to correct that harm." 18

Case 2:23-cv-00980-PP   Filed 03/06/24   Page 27 of 30   Document 15

U.S.C. §3626(a)(2); see also Westefer v. Neal, 682 F.3d 679, 683 (7th Cir. 2012) (noting the PLRA "enforces a point repeatedly made by the Supreme Court in cases challenging prison conditions: [P]rison officials have broad administrative and discretionary authority over the institutions they manage" (internal quotation marks and citation omitted)). The plaintiff has identified no harm that needs correcting, and there is no basis for the court to provide him injunctive relief. The court will deny his request for an injunction.

## IV.    Conclusion

The court **GRANTS** the plaintiff's motion for leave to proceed without prepaying the filing fee. Dkt. No. 2.

The court **DENIES WITHOUT PREJUDICE** the plaintiff's motions to appoint counsel. Dkt. Nos. 9, 12.

The court **DENIES** the plaintiff's motion for discovery and request for preliminary injunction. Dkt. No. 9.

The court **CONCLUDES** that the plaintiff's complaint fails to state a claim. Dkt. No. 1.

The court **ORDERS** that the plaintiff may file an amended complaint that complies with the instructions in this order. If the plaintiff chooses to file an amended complaint, he must do so in time for the court to *receive it* by the end of the day on **April 5, 2024**. If the plaintiff files an amended complaint by the end of the day on April 5, 2024, the court will screen the amended complaint as required by 28 U.S.C. §1915A. If the court does not receive an amended complaint by day's end on April 5, 2024, the court will dismiss this case based

28

on the plaintiff's failure to state a claim in his original complaint and will issue him a strike as required by 28 U.S.C. §1915(g).

The court **ORDERS** that the agency that has custody of the plaintiff must collect from his institution trust account the **$281.06** balance of the filing fee by collecting monthly payments from the plaintiff's prison trust account in an amount equal to 20% of the preceding month's income credited to the plaintiff's trust account and forwarding payments to the clerk of court each time the amount in the account exceeds $10 in accordance with 28 U.S.C. §1915(b)(2). The agency must clearly identify the payments by the case name and number. If the plaintiff transfers to another county, state or federal institution, the transferring institution must forward a copy of this order, along with the plaintiff's remaining balance, to the receiving institution.

The court will send a copy of this order to the warden at Dodge Correctional Institution.

The court **ORDERS** that plaintiffs who are incarcerated at Prisoner E-Filing Program institutions[1] must submit all correspondence and case filings to institution staff, who will scan and e-mail documents to the court. Plaintiffs who are incarcerated at all other prison facilities must submit the original document for each filing to the court to the following address:

---

[1] The Prisoner E-Filing Program is mandatory for all persons incarcerated at Green Bay Correctional Institution, Waupun Correctional Institution, Dodge Correctional Institution, Wisconsin Secure Program Facility, Columbia Correctional Institution, and Oshkosh Correctional Institution.

Office of the Clerk
United States District Court
Eastern District of Wisconsin
362 United States Courthouse
517 E. Wisconsin Avenue
Milwaukee, Wisconsin 53202

DO NOT MAIL ANYTHING DIRECTLY TO THE JUDGE'S CHAMBERS. It will only delay the processing of the matter.

The court advises the plaintiff that if he fails to file documents or take other required actions by the deadlines the court sets, the court may dismiss the case based on his failure to diligently pursue it. The parties must notify the clerk of court of any change of address. The court advises the plaintiff that it is his responsibility to promptly notify the court if he is released from custody or transferred to a different institution. The plaintiff's failure to keep the court advised of his address may result in the court dismissing this case without further notice.

The court will include with this order a guide prepared by court staff to address common questions that arise in cases filed by incarcerated persons. Entitled "Answers to Prisoner Litigants' Common Questions," this guide contains information that the plaintiff may find useful in prosecuting his case.

Dated in Milwaukee, Wisconsin this 6th day of March, 2024.

**BY THE COURT:**

**HON. PAMELA PEPPER**
**Chief United States District Judge**